DORÉ, Judge.
This case and the case of George Roundtree v. Baton Rouge Bus Co., Inc., La.App, 58 So.2d 238, arise out of a collision, between a bus of the Baton Rouge Bus Com *233 pany, Inc., being driven by Felbert Daigle, its employee, in the course of his employment, and a truck of the State Highway Department being driven by George Round-1 tree, accompanied by Edward Bankston, Jr., in the course of their employment by the Louisiana Department of Highways. As a result of the collision, George Roundtree sustained severe personal injuries for which he sues the Baton Rouge Bus Company, Inc., and Edward Bankston, Jr., also sustained personal injuries for which he sues the bus company, both plaintiffs alleging that the accident was caused by the sole negligence of Felbert Daigle, the driver of the city bus. Since the two suits involve the same accident and the same facts, they were consolidated for trial, with a separate decree to be rendered.
The collision occurred on February 15, 1951 in the 4700 block of Florida Street in the City of Baton Rouge, at approximately 12:00 noon at which time it was misting rain. Florida Street is a four-lane highway, with two lanes for eastbound traffic and two lanes for westbound traffic with a neutral ground sixteen (16) feet in width. Prior to the accident, the city bus was proceeding in an easterly direction on the south, or outside, lane, that is the slow lane of Florida Street, and the Highway truck was proceeding also in an easterly direction on the north or inside lane, that is the fast lane of Florida Street, at some distance to the rear of the city bus. At the immediate situs of the accident there was a gap in the nuetral ground 48 feet in width for the purpose of permitting traffic going east on Florida Street to return west or traffic going west on Florida Street to return east. The usual route of the city bus called for a turn at the corner of Foster Drive and North Boulevard, a few blocks east of this gap, but due to a bridge being temporarily out on North Boulevard, the city bus was unable to follow its usual route, and as a temporary measure, adopted the aforesaid gap in the neutral ground in order to make a turn and return in a westerly direction. It is shown that in executing this left turn the bus driver made a U-tum from the right hand or southernmost traffic lane on the eastbound side of the neutral ground, on which he had been proceeding all along, and that as his bus had turned onto the neutral ground with the rear thereof protruding at least five (5) feet (as admitted by the bus driver) onto the north or inside lane for eastbound traffic, the truck, which vvas proceeding in that lane struck the rear corner of the bus resulting in the personal injuries complained of in these two cases by the plaintiff Roundtree and the plaintiff Bankston.
As heretofore stated, the plaintiffs alleged that the accident was caused solely by the negligence of the driver of defendant’s bus and particularly in the following respects:
“a. He failed to keep a proper lookout.
“b. He made a left turn from the improper lane of travel.
“c. He made a left turn across the path of petitioner without determining the presence of approaching traffic.
“d. He made a left turn from the improper lane of travel without signaling his intention to do so.'
“e. He made a left turn without first ascertaining that it was safe to do so.
“f. He failed to keep the bus under proper control.
“g. He operated said bus in a careless and reckless manner without due regard to the safety of others in the vicinity at that time.”
The plaintiff Edward Bankston, Jr., claims the sum of $5,701.25 for his injuries and medical expenses and the plaintiff George Roundtree claims the total sum of $30,510 for his injuries, medical expenses and loss of earnings.
In each case, Coal Operators Casualty Company, the workmen’s compensation insurer of the Louisiana Department of Highways, intervened, claiming the amount of its legal subrogation for workmen’s compensation and medical expenses paid, or to be paid, and in its petition of intervention, adopted the allegations of the petitions of plaintiffs.
The defendant, in its answer to each suit, admitted the occurrence of the accident but denied any negligence on the part of its bus driver, alleging that the accident was *234 caused by the sole negligence of plaintiff Roundtree, and in the Roundtree suit, the defendant, in the alternative, pleaded that in the event its driver was found guilty of negligence, proximately causing the accident, then and in that event, plaintiff Roundtree should be found guilty of contributory negligence in bar of recovery, particularly in the following respects:
“(a) Plaintiff was operating the said truck- at an excessive, reckless and unlawful rate of speed.
“(b) Plaintiff failed to keep a proper lookout and to see and observe the presence of the said bus on the highway ahead of him.
“(c) Plaintiff failed to keep the said truck under reasonable control in disregard of the said bus and any other vehicles in the vicinity of the said accident.
“(d) Plaintiff failed to apply brakes or attempt to stop or turn to his right or otherwise attempt to avoid collision, although he had full opportunity to do so, and although he saw or should have seen the said bus attempting to execute a turn from the said highway.
“(e) Plaintiff was operating said truck in a careless, reckless and inattentive manner without due regard for the safety of others using the said highway in the vicinity of the accident”
Following the trial, the trial court rendered judgment in favor of plaintiff Bank-ston in the amount of $2,000 and also allowed the amount which it had been stipulated was due to the intervenor for its compensation subrogation. In the Round-tree case, judgment was rendered in favor of defendant rejecting the demands of Roundtree and of the intervenor. In each case a rehearing was applied for by the party cast. With the exception of adjusting the allowance of intervenor’s demands in the Bankston case, covering minor medical expenses, the rehearings were refused. The defendant, Baton Rouge Bus Company, Inc., has appealed from the adverse judgment in the Bankston case, while the plaintiff George Roundtree, and the intervenor, Coal Operators Casualty Company, have appealed from the adverse judgment m the Roundtree case.
The first question to consider on appeal is whether or not the trial judge committed any manifest error in finding that Felbert Daigle, driver of the city bus, was guilty of negligence which was a proximate cause of the collision. The contention of the plaintiffs is not only that the said Daigle was guilty of negligence which was a proximate cause of the accident but that said negligence was the sole proximate cause thereof. The defendant, on the other hand, contends that the driver of its bus was guilty of no negligence but that even if he were guilty of negligence, that such negligence was not the proximate cause of the accident and that the accident was caused solely by the gross negligence of the truck driver, plaintiff Roundtree, particularly in driving at an excessive rate of speed and in failing to keep a proper lookout.
In so far as the driver Daigle is concerned, it seems clear to us that on his own testimony he convicts himself of gross negligence. He frankly admits that he negotiated the left turn into the gap of the neutral ground from the right-hand or outside lane in clear violation of LSA-R.S. 32:235, paragraph B, which provides that the driver of a vehicle, “when intending to turn to the left shall approach such intersection in the lane for traffic to the right of and nearest the center line of the highway and in turning shall pass beyond the center of the intersection, passing as closely as practicable to the right thereof before turning to the left.”
He gives two excuses for negotiating said turn from the wrong lane of traffic: (1) That he was proceeding in that lane for the reason that there was a bus stop on the right side forty (40) feet distant from the western line of the neutral ground gap, and (2) That he was of the opinion that because of the length of his bus (26' 8") he would be unable to turn left into the neutral ground gap from the inside lane. With reference to the first excuse, there is no dear showing that there was a bus stop at the point stated — merely the statement of Daigle himself, but, regardless, it is very obvious that *235 there was no passenger at the point of the alleged bus stop and therefore no sound reason for the bus driver not to have entered the left lane before arriving at that point. As to the second excuse, as observed by the trial judge, no doubt the bus driver was honestly of the opinion that he could not negotiate the left turn from the inside lane, but the physical facts show that he was guilty of mistaken judgment since it is shown that this gap was forty-eight (48) feet wide, that the bus, although twenty-six feet eight inches (26' 8") long and eight (8) feet wide, could turn sharply (according to the frank admission of the driver himself) and certainly an experienced driver like Mr. Daigle could have negotiated this turn from a ten foot lane. It seems reasonable to say that he could have done so even if he had found it necessary to go slightly to the south of the center line. If he had done so, there would have been no accident.
Moreover, the driver Daigle, in his testimony, states that the only signal that he gave of an intended left turn was a left-hand hand signal when he was at a distance of two or three bus lengths from the western line of the gap; that would be a distance of fifty-three feet four inches (53' 4") or eighty (80') feet from the western line of the said gap. He states that at that time he looked in his rear view mirror and saw a vehicle at a distance of about one and one-half blocks away, stuck his hand outside his bus, and without any further precautions proceeded to make his left-hand turn, using both hands. He further states that he saw no other vehicle, that the visibility was poor due to a misting rain, and yet the evidence shows clearly that to his rear in the same lane of travel at a distance of about 200 feet was the automobile of Mr. O’Quin and that approximately 200 feet to the rear of the O’Quin car was the automobile of Mr. Warmack, and, that, the highway department truck traveling on the inside lane, was ahead of the O’Quin car. From that evidence it seems clear that Mr. Daigle did not look in his rear view mirror or else if he did, failed to see what he should have seen, and again he convicts himself of gross negligence.
Furthermore, it must be noted that although this was an emergency turn for the bus, that no warning whatsoever to the effect that it was going to be used for that purpose was placed at or near the gap in the neutral ground and that Mr. Daigle, an experienced bus driver, was fully cognizant of that fact and for that reason, if for no other reason, should have used extraordinary precautions in making his turn.
He was also fully cognizant of the fact that he was traveling on a wet pavement in a misting rain with visibility poor, again demanding of him extraordinary precaution.
For reasons set forth hereinabove, we are firmly convinced that the defendant’s bus driver was guilty of gross negligence and that said gross negligence was at least one of the proximate causes of the accident.
In so far as the Bankston case is concerned, it is our opinion that liability is established against the defendant upon proof that the bus driver was guilty of negligence which was a proximate cause of the accident. Even if it should be found that the driver of the truck was also guilty of negligence, such negligence cannot be imputed to Bankston who was merely a guest with no control whatsoever of the vehicle. The only serious contention in the Bankston case is with reference to the quantum of damages. As set out by the trial judge, his injuries consisted of shock, cerebral concussion, multiple lacerations on his face and head and aggravation of a serious injury sustained in the late war. He was confined to the hospital for several days, and testified that he suffered severe back pains for several weeks. A large scar on his head remains but is hidden by his hair and does not appear to be a serious disfigurement. We feel that the award of the trial court of $2,000 is fair and should not be disturbed. There is no dispute as to the amount due the intervenor, Coal Operators Casualty Company, in this case.
The really serious question before us is whether or not plaintiff George Roundtree was guilty of contributory negligence barring his recovery. From the testimony of *236 plaintiff Roundtree, it appears that he was traveling on the inside lane at a distance of less than 200 feet to the rear of the bus, which was traveling on the outside lane, immediately before the bus negotiated its ■ left-hand turn. The witness O’Quin testified that he was 200 feet to the rear of the bus and that the Highway Department truck was ahead of him. The preponderance of the evidence is to the effect that- plaintiff Roundtree was traveling at a rate of speed of not more than 35 miles per hour, which cannot be called excessive in view of the fact that he was traveling on the inside lane which is commonly recognized as the fast lane of traffic. His testimony is to the effect that he did not realize that the bus was going to make this left turn until he was too close to it (he says fifteen feet) to avoid crashing into the rear thereof; that he thereupon applied his brakes and turned to his right in an attempt to avoid the collision hut was unable to do so. In other words, it is the contention of this plaintiff that he was met with an emergency created by the defendant’s driver and that he did everything possible to overcome that emergency to no avail. The only point on which plaintiff Roundtree could be convicted of contributory negligence, in our opinion, would he to find him guilty of failing to keep a proper lookout. In that connection it must be noted that Roundtree had driven on Florida Street many times before; that he knew that this gap in the neutral ground was not a bus turn; that he was unaware of the fact thát at the time of the accident it was being used as an emergency turn for the city bus. In that connection, as stated before, no warning sign of any kind had been placed to indicate that it would be used as a bus stop and as a matter of fact, only one turn had been made by the city bus prior to the accident at this gap.
It is our opinion that the only lookout that plaintiff Roundtree was charged with was a lookout for traffic turning left in his lane of travel or for traffic entering the south side of Florida Street through the gap from the north side. We are satisfied from the evidence that the plaintiff Roundtree did not Rave any way to anticipate that the bus was going to make a left-hand turn in .the manner in which it did unless he had seen the hand signal of'the driver thereof, which he did not see, and which his guest did not see, and which Mr. O’Quin, traveling to the rear of the bus, did not see.
There is some question as to the point of impact. The driver of the bus admits that the rear of the bus was at least five feet within the inside lane, which means that at least half of the inside lane was blocked by the bus. The preponderance o-f the evidence is that the bus at the immediate time of the impact had crossed the black center line and was still moving, which accounts to some extent that it was pushed some twelve feet. The defendant contends that the fact the bus was pushed that distance indicates that the truck was traveling at a high rate of speed, hut when we consider that the bus was moving and that the pavement was wet, it is reasonable to conclude that traveling at a rate of 35 miles per hour, that this Flighway Department truck was capable of pushing the bus that distance.
The pertinent conclusion of the fact of the trial judge is as follows: “Considering all this evidence, I am of the opinion that Mr. Roundtree, the driver of the truck, is mistaken as to the facts. I cannot escape the conclusion that the truck was traveling at a much greater speed than the testimony of the occupants indicates, as evidenced by the distance the rear of the bus skidded sideways; that the truck driver was not keeping a proper lookout, and was paying no attention to the situation in front of him; and that he was only a few feet from the bus when he first saw it had left the outside lane. I am of the opinion that, except for his negligence, he could have avoided the accident without difficulty, and that his negligence was the proximate cause of the accident, barring his recovery of the damage claimed.”
We disagree with the trial judge and believe that the proximate cause of this accident was due to the negligence of the bus driver and in our opinion he created an emergency. We do not believe that the plaintiff, Roundtree, was as near to the bus as he said he was, but we are inclined to, believe that if he had been further back he could not have avoided the accident due to *237 the wet street. Furthermore, the emergency .was created by the defendant bus driver in making a left turn and we cannot hold that the .plaintiff was supposed to exercise that same mature and, unerring judgment that was required'and expected of him in meeting and solving problems arising in the normal activities óf life.
With reference to the quantum of damages, we have the following showing:
Dr. Charles McVea who saw plaintiff* Roundtree, states as follows:
“Yes, Mr. ■ Roundtree was somewhat shocked when I first saw him, and his injuries consisted of a compound fracture of his left arm at the elbow, the bone injured being the upper end of the left ulna. He had a fracture of the nose, contusion of the face and chest, a laceration of the lower lip and contusions of both knees. The laceration of his lip was treated and his other injuries were treated, dressings applied, and Mr. Roundtree admitted to the hospital. Subsequently it was necessary to operate on Mr. Roundtree’s arm and wire the fragments of bone together. Another operation was necessary about a week ago to remove a wire from the bone which had united.
“Q. Doctor from February 15th when you first saw Mr. Roundtree has he been continuously disabled? A. I believe so; I do not believe he has returned to work. His arm has only recently returned to a point where he could use it freely and well, and at the moment he cannot use -the arm well because of the recent operation. I believe that within two to three weeks this will have healed and he will be able to do his usual work. He has complained o'f his left knee throughout most of this period and the original x-rays of his knee are within normal limits. Recent films show a small chip of the patella, or knee cap, and this has been a source of discomfort to Mr. Round-tree.”
Dr. McVea further testified as follows:
“Q. Doctor in your opinion with the arm injury and with the present knee condition, would Mr. Roundtree be acceptable for industrial employment at the present time? A. As of today no sir. He still has an unhealed wound on his arm. I believe 'by the 15th of July he could return to his usual activities.”
Dr. O. W. Cosby, an expert eye,' ear, nose and throat specialist, examined the'plaintiff Roundtree a short time before the trial and found that he- had a deviated nasal septum which he" attributes to the accident and which he in effect states should be corrected by an operation at a cost, including medical fees and hospitalization, etc., of approximately $150.
Dr. Thomas Campanella, an orthopedic surgeon, examined the plaintiff Roundtree some time in February, a few days after the accident. He states: “I merely examined the x-ray and made only a casual examination because he was under the care of a local surgeon. My impressions at the time were as follows: he had contusion injuries of the face as well as what appeared to be a broken nose; he had acute sprains and contusions of both knees; he had a contusion of the chest and a comminuted fracture of the left olecranon process of the ulna.”
With reference to the injury to the knee, Dr. Campanella testified as follows:
■ “Q. In regard to the knee injury what were your findings doctor? A.- The patient has slight swelling in the medial aspect of the knee joint over the inferior pole of the patella. Directly over this area it was quite tender to touch and pressure. Further examination revealed by actual measurement no swelling directly over the knee cap, but did show a half inch atrophy of the right quadriceps muscle or the fifth muscle, and a quarter- inch atrophy of the calf muscles. The x-rays were also reviewed and these did reveal a small chip fracture from the patella.”
He states further that if the knee injury persisted after some-two months of activity on the part of plaintiff Roundtree, that he would recommend an operation for the removal of the bone chip in the knee cap; that the condition is a minor one but that the operation would be considered a major procedure because it would involve exposure of bone. He further states that the cost of .-said operation would entail a doctor’s fee of not over $75 and hospitalization *238 for some three days, plus an anaesthetic fee and an operating room fee. Dr. Campanella, as well as Dr. McVea admits that the plaintiff has complained of a catching in the knee and continued pain resulting from the knee injury. He seems to have the impression that after some two months activity on the part of plaintiff Roundtree that the condition might correct itself; but in all probability, the operative procedure would eventually be necessary.
Plaintiff Roundtree in his petition claims medical and hospital expenses incurred in the amount of $500 and future medical expenses in the amount of $500. However, at the trial it was stipulated that the inter-venor, Coal Operators Casualty Company, incurred medical expenses in the amount of $274. From the evidence it appears that the future medical expenses will be $150 to correct the nasal disability, and, $150 to correct the knee disability, making a total of $300, which we feel can be reasonably allowed for future medical expenses, making a total of $574 for that item.
With reference to the loss of earnings, it is shown that plaintiff was disabled from February 15th and according to his physician, Dr. McVea, he will be fully capable of resuming his duties on July 15th, making a total of five months of loss of earnings. In his petition he claims loss of earnings from February 15th to May 15th at the rate of $170 a month, that is $510. This item should be allowed. In his petition he claims loss of future earnings of $15,000, but the only proven loss of future earnings is for the period May 15th to July 15th, that is two months at $170 per month or a total of $340. Accordingly, an award of $850 for the item of loss of earnings is hereby made.
With reference to the items of physical pain and suffering, mental pain and suffering and injuries, the plaintiff claims the total sum of $15,000. From the medical evidence reviewed hereinabove, it does not appear that the plaintiff will remain with any permanent personal injury, but it is shown that he has suffered considerable pain and that he will undergo some future pain and discomfort and probably two comparatively minor operations. It is our opinion that for his injury, pain and suffering he should be granted an award of $5,000.
In view of the above considerations, a total award of $6,424 will be made.
In so far as the intervenor, Coal Operators Casualty Company, is concerned, the award should be for the amount claimed in its petition of $634, representing the amount of compensation and medical payments to date of trial, plus such additional sums of compensation and medical expenses incurred by said intervenor since that date.
For these reasons assigned, the judgment appealed from in the case of Edward Bankston, Jr. v. Baton Rouge Bus Company, Inc., is affirmed.